May it please the court. Judge Rondell, I had originally said I wanted to reserve five minutes. I'll reserve three minutes for it. Three minutes for rebuttal, if that's granted. When I walked into the initial pretrial conference in this case, Judge Bassoon said to me, Well, Mr. Sansone, the lady said your guy did it. Why isn't that probable cause? I said, Judge, I think that Wilson requires much more than that, and I think there is much more than that here. Well, and of course there is more to it than that, because what Mr. Rettner had to say, standing by itself, is something completely separate and apart from what Ms. Hawk said inconsistently at various times. Sort of, except that Ms. Hawk had the opportunity. The only thing that appears in the affidavit of probable cause is the last thing she said. I will forget Ms. Hawk, except I've got to go back to her later, but for the moment, Judge, Mr. Rettner's testimony and the omissions about his testimony are critical. What omissions? First, how they came upon Mr. Rettner. If the judge had known that Mr. Rettner was picked out at random eight years later, and the reason given for him being picked out was he was from that area and he did drugs, the judge might have said, what does that have to do with getting him and finding him? It's too much of a coincidence that they found the perfect witness on reasons that make no sense. So that's the first thing. The second problem with Mr. Rettner is... I don't know why that makes what he says unreliable. How is that relevant? It's the beginning of a series of facts that suggest that he's completely unreliable, but worse, suggests that the police didn't find him, they invented him. Where is that in the record? They invented him as a witness. They put words in his mouth. Why would they do that? Because they wanted to find somebody besides the real murderer. Where is it in the record that they invented him? What in the record makes whatever he said unreliable? The ten different times that he said, I will make a deal and say whatever they want. You take things out of context. Well, first of all, I'm asking... In quoting what he said, you leave out key phrases in what he said. Well, first of all, I didn't quote all ten times that he said that, and I didn't quote all nine times that he said they're trying to coerce me into saying this. But he didn't make a deal, and he was at risk in prison. Not only did he not make a deal, what was there to deal about, and why would he have lied for a deal when the guy, by his own admission, is in there on a DUI and only has another couple of months? Because when they dragged him in there for no reason, you read what he says... You're talking too fast, Mr. Sands. When they dragged him, Mr. Reckner, in for no reason... When the police came to him, armed with pictures of my client and Mr. Ritsky ahead of time, and they brought him into a questioning room... Wait a minute. Wait a minute. He made his identification verbally before he ever saw a picture. No, sir. They had a picture. If you read what he says... No, he said the guy with the dark hair. That's right. The guy with the dark hair. He showed the picture later. He said, yeah, that's him. If you read what he says in his statement, I don't want to just contradict you, but he says, I went down there and he had a picture with him of Rhonda Dorisky. Mr. Sands, we need to focus on what was known to Trooper Pierce at the time that the affidavit was filled out. And we're not going to speculate. We can draw inferences in your client's favor from the evidence that was developed. But where in this record, in either the deposition of the troopers or in any deposition of Mr. Reckner, did you elicit any testimony about when the trooper heard the tapes or whether Mr. Reckner conveyed to the troopers that he was willing to say anything and didn't really hear anything at this party, was just trying to make a deal? We can't just speculate about that as a basis for a finding of lack of probable cause. First of all, you don't have to speculate that he was more than willing to make a deal and that he would say what he did not know because of what they were forcing him to do. Tell us how we know that. How do we know that? On what evidentiary basis do we know that? He says they came into the prison. Says that how, when, and to whom? Mr. Reckner says that when these police officers came to the prison armed with a photograph of Ron Dorinsky to show him. To whom did he say that, when, and in what? It's in the record. What do you mean? It's in the record. That's in the record. I'm not asking if it's in the record. I know it's in the record. I've read the transcripts. Let me cut to the chase. You're referring to the transcript of the telephone conferences made out of the prison? Is that what you're referring to? No, the telephone calls within the prison made by Reckner. Made to outside of the prison. Made to someone else, right? During which he repeats a lot of the same things that he had told Pierce and says, gee, we thought he was just joking and da-da. He almost corroborates the story. I read the record and every single time he talks about this, he never, never identifies Warren Bircher. He says, some kid. Warren Bircher and he were near the same age. It's not clear why he would say some kid if he's talking about Warren Bircher. Secondly, there's nothing in this affidavit that explains to the judge's name. We're jumping around so quickly. Mr. Sansone, please. We're jumping around so quickly. I don't even know what you're referring to. Let me try this way. The evidence in the record to me suggests that this individual was, number one, coerced by the police. He says, they came in here and threatened me. They asked to take my DNA. They said I can't go there. And that is what appears in the transcript of telephone conversations, two of them, which he was a party to while he was in prison. How is that admissible evidence ultimately? Well, first of all, if he testifies that I was coerced by the police to make this statement. How are the statements admissible evidence? The statements in the telephone conference? Yeah. This is summary judgment. They are hearsay at this stage. It has to be even at summary judgment. We can only consider what would be admissible evidence, right? His testimony would be admissible. Did he testify by deposition? No. Well, then all you have is inadmissible evidence at that stage, right? I don't think so, Judge. I think if he's called to testify by submitting a trial, which would be my intention, he would be then asked, were you coerced? But isn't that evidence that you really needed to elicit before summary judgment motion? We would have, Your Honor. So that it is admissible evidence as opposed to what is technical hearsay right now. We would have, but Mr. Reckner was in the wind. We have searched for him. We haven't found him yet. We expect to find him. We have some leads on him, but haven't found him at that time. Well, I haven't seen any evidence in the record, including in the deposition of the troopers, about when it was that the troopers even heard the tapes, even assuming there's information in those tapes that should have been included. Where is there any evidence that that was known to the troopers before filing the affidavit? Well, first of all, the troopers are the ones that requested these transcriptions. So they knew at some point prior to the criminal trial of the case. But the point is this. If Mr. Reckner were to be called to trial and said he was coerced, that would obviously mean that the troopers didn't need to know when he said these things. But that's a huge if, isn't it? Because you have nothing in the record that's admissible to demonstrate. If you take the evidence in a light most favorable to my client, you have a guy here who says he's being coerced into saying this. He'll say what they want. The quote we give you is this, and it's from page 38 of the record. He says, I already told him, which is Pierce. I says I don't even know what was said at that party. All I'm telling him is I'm going to say the following things that they wanted to hear. He says I didn't even know what was said at that party. This is a malicious prosecution claim. So we need to look at whether there was deliberate or reckless omission or false statements by the trooper in filing the affidavit of probable cause. Don't you need to show then what was known to the trooper at the time? And in the absence of you having induced that on the record, how can we do anything but speculate? I already told him I don't know what was said at that party. This is evidence that this witness, that's their key witness, did not know what was said at that party. But he says this is what I'm going to tell them if they let me out. Our case law says that even assuming that that was heard, if it's the case that the trooper completely discredits the evidence or statements, that that's not something that is necessary to include in the probable cause affidavit. That would not be the basis for a malicious prosecution claim. I have so much more to say that I'm going to try to answer quickly. If I'm the judge, I want to know that the troopers went in there on multiple occasions, not just the one that they mentioned in the affidavit of probable cause, and tried to coerce him by saying if you don't give us what you need, we're going to take your DNA, we're going to put a lie detector on you, and we're going to find out if you had something to do with this. And also, what is also not in there, they never told the judge. This guy identified the wrong person as the mother, the wrong person as the father, the person he said was the mother wasn't even in Pennsylvania at the time, and certainly couldn't have been present at the time that he says that she was there, Ms. Rhonda Duritsky. But isn't that something that then, you know, a further investigation does uncover? But the police don't have to conduct a full and complete investigation before they arrest someone. If they went with the wrong person's picture, and they went with my client's picture, who had never been implicated prior to that, and they coerced from... See, the problem is, we've also got a small town here. I mean, one of the reasons Pierce went to Reckner is because they both were from the same small town. But there's hundreds of people from that, there's thousands of people from that small town. Yeah, but not everybody lived really right close to the creek where the body was found. Robert Furtis is not known as being one of the more cosmopolitan sinners in western Pennsylvania. I'm sure he's not. Let me also say this about what was omitted from the affidavit of probable cause, because I'm running out of time. There was nothing in the affidavit of probable cause about another suspect who was far more likely to have committed this crime. There's nothing in the affidavit that says, at the time that this woman gave her statement, she told the police, my father, and if you look at her first statement, it's replete with remarks about her father. What does her statement have to do with the narrow focus that we are called upon to employ here? And that is to look at the probable cause affidavit, and once the averments relative to Sarah Hawk are stripped out of there, and we are left with Reckner's, it is either PC or it is not PC. Why are we left with Reckner's? Why didn't the judge find out that the man who says, don't bring any nigger babies to my house, and she said in her first statement, I gave birth in my parents' home, probably 15 feet from my mother and my father. My father said don't bring any of his children around here. That baby was wrapped in his shirt. Why didn't the judge find out that there was a suspect who has never been questioned, neither the mother nor the father of that woman. Are you sure of that? Yes, Your Honor. Are you sure that Trooper Pierce never went to talk to the parents? Absolutely. There's hundreds of pages in this report. He never asked them any of those questions. The only thing, initially there was a police that went around and said, does anybody know anything about this? So if you call that questioning, yes. There was never, after she said, my dad the racist, said don't bring any of these children around here, and the baby was wrapped in his shirt, and I had this birth, which she described in lucid detail. This is a 16-year-old describing a birth. She says I had this in my parents' home. There was never a questioning of that father who said, I don't want you bringing any of these babies around here, and whose shirt was wrapped around that baby. We are at a stage where the district court found, and the government, as I understand it, concedes that her prior statements were recalcitrant. This is an omission that was not included in the affidavit, because the judge would want to know. That is already conceded. Please let Judge Krauss answer the question. Thank you. That is already conceded. So the question before us is really one of materiality. Does it matter? And in Wilson and Reedy, don't we say that what a court needs to do is to reconstruct the affidavit, putting back in all the things that should have been included. Where was that? In Wilson, we did that. Sure. We were able to do that ourselves. So do it here. If we do that, and what we have before us is an affidavit that now has all of these facts, four different versions of Sarah Hawk's statement, and Rector's statements, even though you have Sarah Hawk as this witness who has changed her story a number of times, when you look at the thrust of her final version of events, and you look at Rector's statements, and you look at other circumstantial evidence that was included as to where the baby was found in proximity, why isn't that enough to say that there would be probable cause anyway? Materiality is not satisfied. Rector's credibility is an issue. And Sweeney says where credibility is the main issue, it should be the issue of probable cause comes to the forefront. In this case, there was never anything in the affidavit about another suspect that was far more probable that was never questioned. These facts take into account the question of the police officers in this case. The other suspect that you're referring to now is the father? Robert Hawk. I'm sorry, what was his name? Robert Hawk. He's the father. He's the one that said don't bring any of these children around here. But the fact that there might be another person who maybe you should look into. Who's a better suspect. Pardon? Who's a better suspect. That's a matter of total conjecture that he's a better suspect. If we have Heckner saying this and we have Hawk, whose lawyer calls and says my client wasn't entirely truthful, and then she comes in and she tells on her, she says her sister's husband has been either molesting her or having an intercourse with her. That's not something you do lightly. You went back to that issue. She didn't say that until the last time. And she didn't say that until she was aware. She said it the third time. No, no, no. Don't get that wrong. December 8th she said it. And then January 19th. December 8th she says the bircher helped deliver the baby, got plastic bags in a backpack, which makes a lot more sense. Her first statement when she said it was her alone, she says I don't know where I got the plastic bags in the kitchen, but I don't remember going and getting them. She did all this. It makes no sense. What makes sense is there's her mother right there and her father right there. Well, it makes no sense, especially when you combine it with Reckner's. You say, you know, she wasn't doing this alone. Remember, she didn't implicate my client in the murder of that baby until the fourth statement. It was only until and after Reckner's statements were given to her by the district attorney. You have to – this is immediate. All right. You reserve time for rebuttal. Thank you. If we'll hear from you then. Thank you. Good morning, Your Honors. Kamala Alexander Marichli for the state police troopers who are athletes in this case. May I begin by remarking at the outset that there is a means, I suggest, of cutting all Gorian knots in this case by resolving the ruling below and affirming Judge Bassoon's judgment on two reasons, which are nevertheless solidly demonstrated of record, but which were not reasons on which she based her ruling. And one of them is derivative prosecutorial immunity. And the other is collateral estoppel. We don't reach those unless there was error here. So we need to address that first, don't we? Very well, Your Honor. I was of the opinion that you could circumvent the necessity for wrestling with the question of whether there were error here. Well, let me ask you, our case law in Wilson provided some guidance and explicit instruction really to the district courts as to a methodology that we wanted to see employed in reconstructing an affidavit. In Reedy, the district court did exactly that and went through in a very careful way with putting those statements back in, this kind of surgical reconstruction. We disagreed with the district court's analysis when it came up on appeal, but we had that to work with. The district court here simply didn't do that. Why shouldn't we remand for the district court to undertake the analysis that we've said is required? As I noted in your questioning to my learned opponent, you said that, in fact, Judge Krause, the appellate court could do that because it's, in fact, a legal construct and it's a legal ruling and it can be done while the better practice may be to, and you may wish to guide the district courts in this in whatever opinion you choose to write, while I suggest to use a term from common modern parlance, best practices may be to do that, which is what Judge Cercone did in the Reedy case. I don't believe that it's necessary to do that in order to ensure that the ruling is affirmed, if from the existing record this court can, in fact, perform the methodology that Wilson's rule was necessary. And I would suggest that if you read the Wilson case carefully, that Chief Judge Becker's opinion in that case seems to say to me that, in fact, in that seminal case, they employed the methodology for the first time in analyzing. Well, exactly, but that only says that when we're doing it for the first time and explaining what we want to see done, we're the ones doing it. Yes. From that point forward, we expect that the district courts will take that guidance and provide us with that reconstructed affidavit so that we know and can review in a meaningful way which statements are deemed recklessly omitted or false statements. With all due respect, Judge Krause, I think the time has come for this court to precisely and actually say that because I don't believe that it is that clear in the Wilson case. Well, to determine the materiality of the misstatements and omissions we excise the offending inaccuracies, which would be if there is a misstatement, and insert the facts recklessly omitted. Presumably that is if there is an omission. Here, with respect to Hawk, there was an omission. So we said insert the facts recklessly omitted and then determine whether or not the corrected warrant affidavit would establish probable cause. The problem with what the court did here is that looking only at Rechner and taking out Hawk entirely, you don't account for the possibility that looking at the whole corrected affidavit with all of her statements and then with Rechner, you might find a different situation. I see. However, I think what the judge did was notionally proceed under Wilson v. Russo. It reminds me of arithmetic class when I was a child and the primary school teachers telling one, show your work. Don't just give me the answer. And in this case, I think Judge Bassoon's opinion can be criticized. But bottom line, Rechner's statements were in there and they were credible and they weren't going to be detracted from, if you will, by what Hawk said. If I can add a slight corollary to that, all the problems here seem to be with the statements of Sarah Hawk. Okay, let's throw them out. We still have probable cause in this warrant. Is that the Wilson v. Russo methodology? I submit it is. Is it the most satisfying and the most appropriate way? I submit with all fairness. Wilson talks about a corrected affidavit. We're not saying at all throw them out. Wilson says that you put in what was recklessly or deliberately omitted. You correct it and then look at it. And because that calculus, as Judge Randall observes, can be different in a given case. Do we really want to say, and analyzing carefully even the facts here, would the district court be saying that when you have statements of a jailhouse informant, eight years after the fact, someone who is seeking more lenient treatment and who acknowledges that he read the public reports and is giving some broad statements that are then consistent with what is in the newspaper, that that alone, coming before a magistrate, that a magistrate would say, sure, probable cause? Do we even want to address that as the question? Or do we want to look at what may, in this case, perhaps be an even stronger affidavit if you put Sarah Hawk's statements in? Well, that's why, if you'll excuse me, that's why I made the alternative argument in Section D where I put Sarah Hawk's statements in together with everything else and argued that you can do the Wilson v. Russo analysis as was done in Wilson v. Russo and reach that conclusion. Remember, we're talking about probable cause. This man was quick. There's no question there was reasonable doubt and that there were all sorts of problems and all sorts of questions that have never and probably never will be answered. The fact is, if you put this in and you look at Shara V. Felsen and you look at this case, you see some real similarities here. This is a very fraught relationship, personal relationship, akin to a victim of domestic violence. In that situation, the courts have been tolerant of such victims, women, who have gradually... We don't have two different standards here. No, we don't have two different standards, but we have a question... It's PC or it's not PC. That's correct, but we have progressive revelation... Is your position that functionally, what was done here or what we do is ultimately what we do. We can't do what Wilson v. Russo requires the district court to do. That's my basic position, and if you do that, you'll come to the conclusion that playing in Sarah Hawk's statement, you still have probable cause despite the fact she made a progressive series of revelations under all the circumstances as they bear in this case. But you can also do it the alternative way that I think, but I've had my eyes opened to some extent by Judge Krause's question, and I had never thought that you couldn't simply evade the difficulties by just focusing on what was there that does provide probable cause, that the difficulties themselves must be considered in context along with what is solid. And I think Rettner's solid, and I understand clearly that this court has read the transcripts of the telephone conversations, and they're not as simplistic as my learned opponent would have you say in terms of Rettner in some sense disavowing what he told the police. First, they took place, all of them took place after he'd already given the statement. Aren't these really credibility kinds of determinations as to the troopers' motivations, what was communicated from Rettner to the troopers before the filing of the affidavit, whether the troopers listened to the tape before filing the affidavit? Why aren't these the kinds of questions that as to materiality are really jury questions? Well, for one thing, as far as Rettner's telephone conversations are concerned, my learned opponent had an opportunity to prove Pierce's deposition. He never asked him anything about what did you know, when did you know it, when did you come in contact with these tapes, did you ever even have these tapes? Somebody got them, and we gave them to him. But the point is we don't know when that happened or anything like that, or whether Pierce was even involved specifically with their acquisition or in any way was aware of them at the time he was the defiant for the affidavit. But we do know as a factual matter that he had the tapes before filing that probable cause affidavit. No, we do not. We do not know that. We don't know. Those tapes were not transcribed until Mr. Sansone had them transcribed for the summary judgment in this particular case. They were only acquired by us from the Office of Chief Counsel. I don't know where the Chief Counsel's Office got them, from the troop, from Pierce, I'm not sure. But they were acquired for... Is that in the record as to when they were transcribed? Yes. It's on the front of each conversation that the transcriptions were made in January of last year, 2014. Of course they could be listened to, I understand that. Oh, yeah, exactly. Are you saying the tapes were not ordered by the troopers before... I'm saying I don't know. They were recorded June 14, 2008. By Fayette County Jail. Okay, so they were available. They were available. We don't know, though. We never asked them, did you get these tapes, do you have these tapes? And when did you listen to them? When did you listen to them? I mean, there was a murder prosecution after this, and they definitely looked at Sarah Hoch's tapes, and they definitely looked at Bircher's tapes. There was an, I agree, inconclusive tape from Mr. Warren Bircher to somebody talking about, can we nail down something about this party at the moon? And the prosecution tried to make something out of that as corroborating Reckner's statement. You know, there was a lot of evidence that was obtained after the arrest took place in this case, and I'm just saying that these tapes may have been not even listened to at that point. They may have been, but at summary judgment, when we're supposed to draw all inferences in favor of non-moving party, doesn't that may have mean that we've still got a material issue of fact? No, Your Honor, because in order for him to have left them out, he had to have had them mentally, if not actually transcribed. He had to have known that Reckner made telephone calls to his mother in which Reckner said what we have. Do we know that? I was, there was a lengthy deposition through Pierce, which I read several times. He was never asked. He was never asked. When did you, they had the phone calls by that time. You're saying Fayette County had, where the prison was, where the jail was. Yeah. And Pierce was with what? The Pennsylvania State Police. Police, right, yeah, okay. So, you know, I don't know when he got them. He may have got them. He may have listened to them, but he may have done it long after he arrested Berger. We don't know. I think in order for them to be part of the matrix that Judge Krause talked about, they have to have been in play. He has to have left them out. He has to have omitted them. He had to have had them or knowledge of them or sufficient knowledge of them in order to decide, I'm not going to put this in, which is what happened in Reedy, you know, where he deliberately lied and he omitted things and all sorts of, and he ran with the hare and hunted with the hound. Sometimes it was a serial rape. Other times she was just trying to hide her own theft. I mean, we don't have anything like that here. But on the other hand, it's obvious in the Reedy case, perhaps because they employed the methodology in Wilson so carefully and scrupulously, what it was that Detective Evanson was omitting and falsely stating. And the deposition here just simply doesn't come to grips with this. Now all of a sudden it's very important. Why wasn't it important when you had him on the stand at the deposition? Why didn't you tell him, oh, why did you leave these things out? You knew about them and you left them out. Don't you think that's a problem? Then we'd have a very different case. But we don't have that case here. We just have something where, as Judge Bassoon said, we're supposed to speculate that they had all this information. It's years later. There's been a failed homicide prosecution. There's all sorts of evidence that wasn't available at the time the affidavit was filed. We can't take it all back. Wouldn't that be nice for their position because he was found not guilty? We can't take all the evidence and everything that's emerged since and play it back in at another time to see whether or not the relatively lenient standard of probable cause was met. Okay. Thank you. Thank you for your time. Mr. Santone, you're reserved two minutes? Three minutes. Three minutes. May it please the Court. We are now turning on the record evidence completely. And Judge Smith has asked me questions about why Reckner's evidence isn't admissible the way it is or why it is that it does not point to a witness whose testimony is not credible. Your Honor, Judge Rendell, you said this is credible testimony by Reckner. It is not credible if you take it in a light, when you view it in a light with Reckner's statements. But the statements that you rely on so heavily that are in the telephone conversation, do we know when Pierce knew of those statements? May I respectfully suggest that that is a red herring, and here's why. If Pierce put him up to doing this, if Reckner's statements viewed in a light most favorable to the plaintiff, There you go again using if when we don't have anything in the record. Reckner says you're trying to force me to do this. He said I told him I don't know what was set up there, but I will say this if they let me out of here. He said that in a telephone conversation, but we don't know when Pierce learned of it. If Reckner did that, if Pierce was told that, and you have to accept that. Reedy says you have to accept my evidence is true. If Reckner said that to the police, then the police knew that he didn't know what was said. I repeat my question before. Do we have to accept your so-called evidence if it's not admissible? If it can lead to admissible evidence, you have to take all inferences that rise from that evidence. I repeat, the evidence as it stands in the record is inadmissible. Is it something that we can consider? I believe the answer is yes. And I think that the answer is that, here's the thing. You have a master judge that had the opportunity to issue a warrant. Had he known that the police had taken these efforts to force this man to say what he said, I think that judge would have said, wait a minute, I'm going to look hard at this. If Reckner is all we have here, if that affidavit is corrected and Reckner is all we have, are his statements credible or were they forced? And this is evidence that they were forced? I didn't ask Pierce, did you coerce the statements of this witness? Did you threaten him? Because I had evidence that he did so. I didn't expect a police officer to say, yes, I did, in fact, coerce this evidence. I didn't expect him to put it in the affidavit. That's not a reason not to ask the question in a deposition or to confront a witness with what you think is contrary evidence. I'm sorry, what did you say? That's not a reason not to ask the question in a deposition or to confront the witness with what you think is inconsistent evidence. I think this is a false assertion by the police officers that Reckner made these statements of his own free will. I think inherent in their affidavit of probable causes, Reckner came forward with these statements and made them of his own free will. I think that when I have clear evidence that this witness was coerced into doing so and that his coerced testimony formed the basis of the final accusation against my client with the mother of this child, I think that the magistrate judge would have wanted to know that. When Judge Rendell said this was credible remarks by Mr. Reckner, I say that there's evidence in this record that it was not. And had the magistrate judge known all of the efforts that these police officers did over several visits, not just two, to get this guy to say what he wanted after he told them, I don't know what was said there, that's something I would have wanted to know as a judge before I say I'm going to issue a warrant for arrest. My time is over, but thank you very much. Thank you very much. We'll take the case under advisement.